1
2
3
4
5
6                     UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8

9    RICKY MENDOZA,                          Case No.  18-cv-07160-SI

10                  Plaintiff,

11           v.                              **ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS**
12   WILLIAM SULLIVAN,
                                             Re: Dkt. No. 21
13                  Defendant.

14

15          Before the Court is petitioner Ricky Mendoza's petition for writ of habeas corpus, filed

16   pursuant to 28 U.S.C. § 2254, challenging his state court conviction for first-degree murder with

17   gang enhancements.  Dkt. No. 21.  Based on careful review of the state court record, the Court finds

18   petitioner has not met his burden under section 2254(d) on Grounds 1, 2, 3, 4, 5, and 6. The Court

19   thus **DENIES** the petition for writ of habeas corpus.

20

21

22                                **I BACKGROUND**

23   **A. Procedural History**

24          On June 25, 2013, a California jury found petitioner guilty of first-degree murder with

25   criminal street gang enhancements in the death of Martin Navarro.  Dkt. No. 13-5 at 117-120.

26   (summary of verdicts).  The jury also found petitioner personally used and discharged a firearm and

27   committed the murder "for criminal street gang purpose."  *Id*.  The trial court sentenced petitioner

28   to a term of life without the possibility of parole plus twenty-five years to life.  Dkt. No. 13-6 at

1643 (report and sentence).

The California Court of Appeal affirmed petitioner's conviction on May 22, 2017.  Ex. 9. Dkt. No. 13-10 at 263 (Court of Appeal decision).[1]  The California Supreme Court summarily denied review on August 30, 2017.  Ex. 11, Dkt. No. 13-10 at 453 (denial).  Petitioner filed the instant writ of habeas corpus in the Northern District of California on November 27, 2018.  Dkt. Nos. 1 (initially unsigned); 21 (later signed by petitioner pursuant to Court's order).

**B. The Crime**

Per 28 U.S.C. § 2254(e)(1), the court presents and presumes as true the following recitation of facts from the California Court of Appeal opinion:

> **A. The Birthday Party**
>
> On the evening of August 20, 2011, twin brothers Erick and Edgar Tejeda celebrated their 18th birthday with a party in the garage of their Antioch home. The brothers hired a deejay and posted an invitation on Facebook. By about 9:30 or 10:00 p.m., about 30 young people were in the garage. There was music, dancing, and flashing colored lights. Erick's girlfriend, Janicett Villegas, was at the party. Her friend Martin Navarro was also there with his cousin Gregorio Navarro. Brothers Brian and Francisco Serrano were there too.
>
> At some point, the friends noticed a new group had arrived at the party. Brian Serrano immediately recognized one of the new arrivals, George Hellums, whom he knew from school, but he did not know the others. Neither Erick nor Edgar Tejeda knew the group. The newcomers arrived in three cars, and entered the party together. Jessica Juarez drove one of the cars, bringing three girlfriends, Cristina Boggiano, Breana Uriarte, and Guadalupe Sanchez. George Hellums drove another car, bringing Tony Martin, Chris Donaldson, and Jairo Bermudez Robinson. According to George Hellums and Tony Martin, defendants Ricky Mendoza and Leon Moreno arrived in a third car with their girlfriends, Amanda Blotzer and Melissa Vargas.[2]

---

[1] On October 26, 2018, the California Court of Appeal reaffirmed the conviction but ordered a limited remand to consider an issue which does not affect the present writ of habeas corpus.  Ex. 12, Dkt. No. 13-10 at 455.

[2] Neither defendant offered evidence they were elsewhere at the time and video surveillance tape shown to the jury confirmed both had been with others in the group earlier the same day.

United States District Court
Northern District of California

The young men in the group were members of the Norteño criminal street gang.[3] Jessica Juarez was the girlfriend of a Norteño member (Carlos Guzman). The group carried a gallon-size bottle of cognac and a bottle of coca cola that they had been sharing earlier in the day into the garage with them, where they continued drinking from both.

According to George Hellums, at some point Jessica Juarez pointed to someone in the back left corner of the garage, telling her group the person was a "Scrap," meaning a member of the rival criminal street gang, the Sureños, and had snitched on her boyfriend, a Norteño. The jury heard expert testimony that Norteños and Sureños were engaged in a turf war in Antioch at the time and their members were obligated, under gang rules, to attack each other on sight.

Guadalupe Sanchez was standing in the same general part of the garage as Juarez. She also remembered Juarez pointing to someone, but did not recall Juarez saying the word "Scrap." She heard Juarez tell George Hellums and others in the group, "That's my ex." The other two young women who had arrived in Juarez's car, Cristina Boggiano and Breana Uriarte, also remembered Juarez saying that her ex-boyfriend was at the party.

Martin Navarro was an associate of the Los Monkeys Treces, a subset of the Sureño street gang. He wore a typical Sureño shirt at the party, blue with white stripes, and he had a blue bandana in his pocket.[4] He was standing near Edgar and Erick Tejeda at the time, in the back left corner of the garage, near a door to the backyard, and some household appliances. Janicett Villegas, also nearby, recalled a girl pointing at Martin and Martin's cousin, Gregorio Navarro, remembered someone staring in their direction.

Appearing upset, Jessica Juarez left the garage, and the others followed. Pacing with her cell phone in the driveway outside, Jessica made calls and texted. Then she spoke to the young men in her group, and at least some members of the group went back inside the garage, returning to the party.[5]

---

[3] Defendants do not contest this point on appeal.

[4] Blue is the Sureño's color. Norteño's favor red.

[5] There was some disagreement among the witnesses about whether George Hellums went back inside the garage. Hellums testified that he remained outside, and Brian Serrano, who had recognized Hellums earlier, did not see him during the events that followed. Tony Martin testified that he thought Hellums had been with the group that returned to the party, but did not see Hellums inside the garage shortly afterward as events unfolded.

Inside the garage, Cristina Boggiano saw Jessica Juarez speaking to a group that included Tony Martin and defendant Moreno. Moreno was Latino in appearance, had long side burns with a goatee, and wore his long curly hair in a ponytail. The Tejeda twins and Brian Serrano all recalled a person matching this description walking over to the left corner of the garage, with at least two others following. The twins saw the same person punch Martin Navarro in the face.[6] Edgar Tejeda later said he thought the person might be Moreno.

Tony Martin testified he saw the incident also and the assailant was his friend, defendant Moreno.[7] When he saw his friend punch Navarro, Martin testified, he jogged over to help his friend; but he held back when he saw defendant Moreno had the upper hand, remaining nearby to "make sure nobody jumped in." Martin Navarro had covered his face with his arms, and was ducking down. Navarro and defendant Moreno exchanged a few words and then Moreno punched Navarro in the face again.

Erick Tejeda moved forward to try to break up the fight at this point, but someone put up an arm to stop him, saying "Don't touch my brother." Tony Martin testified he was that person.[8] A crowd had formed a circle around Martin Navarro and his assailant by this time and people were yelling. Guadalupe Sanchez had a bad feeling and knew something bad was about to happen. Janicett Villegas later told a grand jury she heard someone say, "Fuck you, Scrap."[9]

As Edgar Tejeda watched, Martin Navarro turned and tried to run through the door near where he had been standing, but he was shot before he could escape. Edgar heard three or four shots but did not see who had the gun. His brother, Erick Tejeda, was about five feet from the shooter and saw the gun, a revolver, but could not identify the shooter. Everything had happened too fast, and he was not sure what he had seen.

Tony Martin was the only one to identify the shooter at trial.[10]

---

[6] Brian Serrano could not see what happened because a crowd gathered, blocking his view, although he did see someone throw a punch.

[7] Defendant Moreno agrees the trial evidence showed he punched Martin Navarro.

[8] According to Martin, he said, "Don't touch my brody," meaning "brother."

[9] Although she had been standing near her friend Martin Navarro at the time, and tried to stop the attack by getting between Navarro and his assailant, at trial Villegas testified that she did not remember anything about the assailant's appearance, or having heard anyone say "Fuck you, Scrap."

[10] Antioch police detective James Stenger, an expert on the Norteño and Sureño criminal street gangs, testified that community members may be beaten or shot for speaking to law enforcement about gang-related crimes. Most of the 30 to 40 people whom police interviewed in this case were reluctant to provide information. Guadalupe Sanchez agreed she was reluctant to

United States District Court
Northern District of California

According to Martin, he had been standing about two feet behind defendant Moreno, next to Chris Donaldson, when defendant Ricky Mendoza grabbed and pushed him, and then defendant Moreno, out of the way and began shooting at Martin Navarro with a .357 revolver, hitting Navarro twice in the stomach. When Navarro tried to turn as if to exit through the nearby door, Martin saw defendant Mendoza shoot him again twice in the lower body. Navarro did not survive.

An expert in forensic pathology and cause of death, who performed Martin Navarro's autopsy, testified that Navarro had blunt force injuries or abrasions on his mouth consistent with a blow from a fist or blunt instrument and four gunshot wounds, two of which were fatal. An ammunition expert testified that bullet fragments taken from Navarro's body could have been fired by a .357 revolver but not from a Hi-Point pistol because of the latter's unique rifling characteristics.

**B. The Aftermath**

After the shots were fired, the group that had arrived with defendants Mendoza and Moreno ran back to their cars. As Tony Martin was running to the car in which he had arrived, he saw George Hellums and Chris Donaldson. Then he saw a two-door gray Honda with tinted windows driving slowly in the middle of the street. Donaldson walked in front of the car, stopping it.

Tony Martin had been carrying his gang's nine-millimeter Hi-Point pistol in the waistband of his pants. When he had ducked under the garage door to leave the party after the shooting, the gun had fallen out and Martin was carrying it in his hand. George Hellums told him to "start busting," and Martin understood this as a direction to shoot at the gray Honda.[11] Hellums had been a gang member for three or four years by then and was senior to Martin who had joined only four or five months earlier. Martin began shooting at the Honda, firing five times at the occupied vehicle while it was about 17 feet from him. At trial, he testified he felt his group was threatened, and fired at the Honda to protect them, without any intent to kill anyone. At least one of the bullets he fired wounded an occupant of the car, Naomi Caballero.[12]

After the gray Honda drove off, Tony Martin got a ride home in Jessica Juarez's car. Meanwhile, George Hellums got into a car with defendant Mendoza, Chris Donaldson, and Jairo Bermudez Robinson.

---

testify, and said it was "nothing anyone want[ed] to do." Cristina Boggiano confirmed she was twice threatened about testifying in this case.

[11] George Hellums denied at trial that he told Tony Martin to "start bustin."

[12] An ammunition expert testified at trial that a bullet collected from Naomi Caballero's shoulder carried the distinctive marking of a Hi-Point firearm.

According to Hellums, when he asked his friends what had happened, defendant Mendoza said he had shot someone twice in the stomach and once in the back. At some later point, Mendoza reportedly told both George Hellums and Tony Martin that he shot Martin Navarro because he was a Scrap.

## C. Text Messages[13]

Later, the evening of the party, George Hellums sent defendant Moreno a text message, "Erase *erythang*[,] *messags*[,] *kal log*" and Moreno replied "Yup." Near the same time, defendant Mendoza and his girlfriend, Amanda Blotzer, exchanged the following text messages: "[Blotzer:] *Yea* I'm *gud*. R u[?] *Dam u* had me *fukn* worried *wen* we got to the car *n u* weren't there." "[Defendant Mendoza:] Make sure *u dont* say *shyt forreal*….*an yo* friend." "[Blotzer:] *Na Wtf we not* big *mouthes* like that[.] don't even trip babe." "[Defendant Mendoza:] *K*."

The next morning, Blotzer texted defendant Mendoza: "He *die n* it says a 17 *yr* old *gurl* got hit." Later that morning, the pair continued texting: "[Blotzer:] News DUH."[14] "[Defendant Mendoza:] Im *watchn it rite* now." "I don't c nothin." "[Blotzer:] IT WAS LIKE FIVE *MINS* INTO THE *7 o clock* news right after the niner game fights." "[Defendant Mendoza:] I *dnt c* it. But *u* have a good day." "[Blotzer:] I wanna talk to you *tho* :(" "[Defendant Mendoza:] If *sumthen eva happns* to me would u stick *bu myside regardless* of *wat it iz*." "[Blotzer:] *Yea* I *wud*." "[Defendant Mendoza:] *U* sure *bout* that[?]" "[Blotzer:] Yea."[15]

## D. Gang Evidence

Gang expert Detective Stenger stated his opinion at trial that defendant Mendoza was a member of the Norteño subset, the Elite Northern Empire (ENE). As support for this conclusion, Stenger relied, among other things, on defendant Mendoza's gang tattoos. Those included the word "Elite" tattooed on his stomach, and the words "Can't Stop" and "Won't Stop" on his forearms. In addition, the parties stipulated that, at some point in the five weeks before Martin Navarro was shot and killed, defendant Mendoza got the words "Real Shooter" and "SK," with a picture of a live round and a question mark, tattooed on the back of his neck. In Stenger's opinion, "Real Shooter" described the role that defendant Mendoza was willing to take for his gang and "SK" meant "Scrap Killer."

---

[13] Italicized portions denote spelling and grammatical errors in the original

[14] Detective Bittner, who obtained defendant Mendoza's cell phone records testified that "DUH" could mean "did you hear?

[15] In his closing argument to the jury, defendant Mendoza's counsel acknowledged that these text messages "establish[ed]" his client was "around" the party.

Expert Stenger also opined that defendant Moreno was a member of the Norteño subset, Crazy Ass Latinos or CAL. Defendant Moreno had the letters C, A, and L tattooed on his right hand and the letters X, I, and V—corresponding to the Roman numeral 14—tattooed on his left hand. Norteños like the number 14 because N is the 14th letter in the alphabet.

### E. Defense Evidence

Defendant Moreno presented no evidence at trial, and his counsel acknowledged in his closing argument that Moreno might have been the one who punched or "brief[ly] scuffle[d]" with the victim, Martin Navarro, at the party. But, he said, Moreno did not anticipate someone else then would pull a gun and shoot Navarro. Rather, counsel maintained, any altercation between Moreno and Navarro was a matter between them as individuals and not a gang dispute.

Defendant Mendoza did not himself testify at trial but attempted to establish through other witnesses that another gang member—George Hellums or Chris Donaldson or both—shot Martin Navarro. The following evidence supported this theory: Tony Martin testified he loaned George Hellums a .38 special a couple of days before the shooting, and George Hellums testified he gave the firearm to Chris Donaldson while they were driving to the party. Donaldson had light-colored hair in a Mongolian cut, i.e., shaved on the sides, and long on top, with a tail in back. Erick Tejeda saw two gang members, one with a Mongolian haircut, follow and stand behind defendant Moreno while he punched Martin Navarro. According to Detective Bittner, in an interview the day after the shooting, Erick said he saw the man with the Mongolian haircut shoot Navarro with a .38. The ammunition expert testified that the bullet fragments removed from Navarro's body could have come from a .38. Shortly after the shooting, defendant Moreno texted Donaldson, "*Were u* at[?] [G]o get out of town and tell me *were u* at."[16] At trial, however, Erick Tejeda did not recall telling the police he had seen the shooter. He testified everything had happened fast, the room was poorly lit, the situation was very stressful, and he only remembered seeing the gun, not the shooter.

Mendoza also called Francisco and Brian Serrano and Antioch police officer Marty Hynes as witnesses in an attempt to show that George Hellums shot at Navarro. According to Officer Hynes, on the night of the shooting Francisco said he saw the shooter, whom he described as a tall, dark-skinned man, possibly a Puerto Rican, wearing a white shirt and a red hat. Other witnesses agreed George Hellums wore a white shirt and red hat at the party and Brian Serrano testified that Hellums was African American.

On cross-examination, however, Brian Serrano testified that he and his brother had compared notes about the shooting before the police arrived.

---

[16] Italicized portions denote spelling and grammatical errors in the original.

In that conversation, Brian testified, Francisco said he thought the shooter was dark-skinned or black,[17] and Brian replied that the only African American he had seen was Hellums, who, he added, had been wearing a white shirt and a red hat. In her closing argument, the prosecutor suggested that Francisco might actually have seen Tony Martin, whom she indicated was Puerto Rican, standing in front of defendant Mendoza when the latter fired his gun and might have thought Martin was the shooter. Francisco Serrano did not go to school with Hellums and did not know him. After talking with his brother, the prosecutor argued, Francisco might have assumed Tony Martin was George Hellums, and given the police the description of Hellums' clothing that his brother had supplied.[18]

Defendants also challenged Tony Martin's credibility, observing that he originally had been indicted as a co-defendant in this case, was charged both with Martin Navarro's murder and attempted murder of Naomi Caballero, and could have received a life sentence if convicted. After the jury deadlocked in a first trial, however, Martin agreed to plead guilty to an unspecified violent felony, with a ten-year sentence, and testified as a witness instead at the second trial.

In the second trial, Martin acknowledged he had lied about the facts of the case in police interviews shortly after the shooting. For example, he originally told the police he had been outside when shots were fired and did not see the shooter. He denied having had a gun at the party, denied knowing anything about the Hi-Point firearm, did not include defendant Mendoza among those with whom he initially said had attended the party, and did not admit shooting at the gray Honda. Although Martin eventually told police that defendant Mendoza had been at the party and that he had walked back into the garage in time to see defendant Mendoza shoot Martin Navarro, he did not tell the police or prosecution he actually had been just feet away at the time of the shooting until almost two years later, just before the start of the second trial.[19] The jury also was advised, pursuant to stipulation between the parties, that Tony Martin was positively identified as the shooter in a different case nine days after Martin Navarro was killed; was charged with murder, attempted robbery, and attempted carjacking, a gang enhancement, and two special allegations; and had been advised in an interview with the district attorney's office that he would receive no deal in the second case for his testimony in this matter.

---

[17] Officer Hynes testified that Francisco did not use the words "black" or "African American" in describing the shooter.

[18] Other witnesses reported Tony Martin had been wearing a red and blue Atlanta Braves hat on the day of the party.

[19] Martin's claim that he was in the garage and stopped Erick Tejeda from intervening to end the fight also arguably was contradicted by Erick's testimony that the person wore a black hoodie, since Martin, Hellums, and Detective Bittner all testified Martin had been wearing a red or burgundy hoodie that day.

United States District Court
Northern District of California

Defendants also challenged George Hellums' credibility. Hellums originally was arrested in connection with Martin Navarro's murder, but was released without being charged 72 hours later after giving a statement to the police. Hellums acknowledged he was afraid when he spoke to the police and could have said anything. When he gave the statement, he left the gang. Later his life and his family's lives were threatened, and he was placed in the California Witness Relocation and Assistance Program (CalWRAP). By the time of trial, he had been in CalWRAP for more than a year and a half, receiving a regular monthly allowance to pay his rent, utilities, and food.

Hellums acknowledged he violated his CalWRAP agreement by lying to the police and later to a grand jury because he was afraid of future prosecution. For example, he lied to both about the direction he ran after the shooting, lied to the police about whether he was wearing a hat at the party, and lied to the grand jury about having seen defendant Mendoza carrying a gun earlier on the day of the party.[20]   Hellums also told the grand jury he had not seen anyone else with a gun that day, although he had seen Tony Martin with the Hi-Point firearm in the evening and had himself given Chris Donaldson the .38. Despite these facts, he was not terminated from CalWRAP, and a separate charge for having been found in possession of an illegal sawed-off shotgun at the time of his arrest remained on hold pending his testimony in this case.

Dkt. No. 13-10, Ex. 9 at 2-11 (footnotes in original, renumbered here).

**C. The Petition**

Ricky Mendoza filed a petition for writ of habeas corpus on November 27, 2018. Dkt. Nos. 1, 21. The petition raises six ground for relief, as follows:

**Ground 1.** The judgment should be reversed because it is based on the uncorroborated testimony of accomplices, violating [California] penal code section 1111 and due process. *Id*. at 19.

**Ground 2.** The judgment violates due process and should be reversed because it is not supported by sufficient evidence. *Id*. at 25.

**Ground 3.** The trial court's restriction on cross-examination of the most critical prosecution witness was an abuse of discretion which violated Mendoza's constitutional rights to confront the witnesses against him, to present a defense, and to due process of law, requiring reversal.  *Id*. at 29.

---

[20] Hellums testified that defendant Mendoza only told him the .357 revolver was in the purse of Amanda Blotzer or Melissa Vargas.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Ground 4.** The prosecutor committed prejudicial misconduct, violating Mr. Mendoza's constitutional rights to confront the witnesses against him, to present a defense, to the effective assistance of counsel, and to due process of law. *Id*. at 36.

**Ground 5.** The jury instruction on accomplice testimony was incorrect and incomplete, violating section 1111 and due process and requiring reversal. *Id*. at 48.

**Ground 6.** Cumulative prejudice violated due process and requires reversal. *Id*. at 51.

On December 21, 2018, this Court ordered respondent to show cause why the petition should not be granted. Dkt. No. 7. Respondent filed an answer on April 12, 2019, Dkt. No. 12, and petitioner filed a traverse on August 19, 2021. Dkt. No. 30. The petition is thus fully briefed. The Court will now proceed to consider the merits of the claims raised therein.

**LEGAL STANDARD**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which creates a "highly deferential" standard for reviewing state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). Under AEDPA, a federal court may not grant habeas relief unless (1) the state court's ruling was "contrary to, or involved an unreasonable application of," Supreme Court precedent that was "clearly established" at the time the state court adjudicated the claim on the merits, 28 U.S.C. § 2254(d)(1); *Greene v. Fisher*, 565 U.S. 34, 39 (2011), or (2) the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The threshold requires "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law

10

beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See also White v. Woodall*, 134 S.Ct. 1697, 1706-07 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."). This high standard is meant to be "difficult to meet," because "the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (citations omitted).

AEDPA's deferential analysis applies only to claims "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. The presumption even applies when a state supreme court summarily denies a claim without issuing a reasoned opinion and "there [is] no lower court opinion to look to." *Wilson v. Sellers*, 138 S. Ct. 1188, 1195 (2018).

In instances where "a state court's decision is unaccompanied by an explanation," a federal habeas petitioner's burden "still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. This inquiry requires a federal court to consider what arguments or theories "could have supported" a merits-decision, and then grant relief if no fairminded jurist would agree that those arguments or theories are consistent with Supreme Court precedent. *Id.* at 102. The existence of a reasoned state court decision simplifies matters. In these cases, even when a higher state court summarily denies review of the state court decision, a federal court will "looks through" the summary denial to the last reasoned decision, and determine whether that reasoned decision is objectively reasonable and consistent with clearly established federal law. *Wilson*, 138 S.Ct. at 1192.

**DISCUSSION**

**A. Due Process Claim Based on Uncorroborated Accomplice Testimony (Ground 1)**

In Ground 1, petitioner asserts his judgment should be reversed because it is based on the uncorroborated testimony of accomplices, violating California Penal Code Section 1111 and federal Due Process.  Dkt. No. 21 at 19.  The Court finds petitioner is not entitled to habeas relief on this basis.

**1. Petitioner's Claim and Decision Below**

Petitioner argues that "none of the non-accomplice eyewitnesses identified" him as the shooter.  Dkt. No. 21 at 19.  Petitioner argues the two eyewitnesses that did identify him—George Hellums and Tony Martin—were both accomplices to the crime, requiring that their testimony be corroborated pursuant to Cal. Penal Code § 1111 ("section 1111") before their testimony could be used to support a conviction.  The trial court's failure to adhere to section 1111, petitioner argues, violated California law and federal due process.

The California Court of Appeal considered petitioner's claims on direct review.  Ex. 9 at 13-21. Dkt. No. 13-10 at 280-81.  The Court of Appeal "presume[d]," based on the record evidence, that "the jury found George Hellums was not an accomplice," relieving Hellums' testimony of the corroboration requirements of section 1111.  Ex. 9 at 18.  Petitioner does not rebut this factual finding with clear and convincing evidence, so it remains presumptively true.   28 U.S.C. § 2254(e)(1).[21]   The Court of Appeal then "assume[d]" that "the jury found Tony Martin was an accomplice," which required, before permitting the jury to rely on Martin's testimony, that there be independent corroborating evidence that "'tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth.'" Ex. 9 at 19 (quoting *People v. Vu*, 143 Cal. App. 4th 1009, 1022 (2006)).

After carefully reviewing the record, the Court of Appeal concluded that there was sufficient

---

[21] In the Traverse, petitioner asserts he "Proved by a Preponderance that Martin and Hellums were Accomplices." Dkt. No. 30 at 46. This utilizes the wrong standard of proof.

independent evidence indicating "that defendant Mendoza was present at the party, had a motive, and made inculpatory statements afterwards." Ex. 9 at 18-21. First, the evidence established that petitioner was with Hellums, Moreno, and several others in the hours leading up to the party, and "later arrived at the party in a car with their girlfriends, but that defendant Mendoza left the party after the shooting in a different car." *Id*. at 19-20. Second, at the time of the shooting, the Norteño and Sureño gangs were engaged in a "turf war," and petitioner was willing to act as "gang enforcer" for the Norteño gang by "shooting and killing any suspected Sureños whom he might encounter." *Id*. at 18. The evidence suggests petitioner had gang tattoos conveying his commitment to be a "Scrap Killer," and, at the party, overheard Jessica Juarez point out the decedent, who was wearing a blue shirt and bandanna, as a "Scrap" (i.e., Sureño). Third, the evidence established that, right after leaving the party, petitioner told Hellums and others in the car that "he had shot someone twice in the stomach and once in the back," and later described the decedent as a "Scrap." *Id*. at 21. The Court of Appeal also referred to the various text messages sent by petitioner to his girlfriend as probative of guilt. *Id*.

### 2. Legal Standard

In California, a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." Cal. Penal Code § 1111. The evidence required by section 1111 "need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." *People v. Fauber*, 2 Cal.4th 792, 9 Cal.Rptr.2d 24, 831 P.2d 249, 273 (1992). Ultimately, section 1111 operates as "a state law requirement that a conviction be based on more than uncorroborated accomplice testimony." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000).

Being a state law rule, habeas relief cannot "lie" for a claim based solely on a state court's erroneous application or interpretation of section 1111. *Id*. at 979. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Accordingly,

1   this Court's task is not to review whether section 1111 was properly applied.

2       Rather, a claim based on California's section 1111 may support habeas relief "only if the

3   alleged violation of section 1111 denied [petitioner their] due process right to fundamental fairness"

4   by "arbitrarily depriv[ing] the defendant of a state law entitlement" inherent in the state law rule.

5   *Laboa,* 224 F.3d at 979 (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)). In *Laboa v. Calderon,*

6   the Ninth Circuit, citing to the Supreme Court's decision in *Hicks,* held that the habeas petitioner

7   was not arbitrarily deprived of his state-created entitlement because there existed adequate

8   corroborative testimony to permit the trial court to find section 1111's standard met.  *Id.* at 979-80.

9   Stated differently, *Laboa* demonstrates that if there is a non-arbitrary basis for the trial court finding

10  an accomplice's testimony satisfactory under section 1111, there can be no federal habeas claim.

11  *Id.  See also People v. Davis,* 36 Cal. 4th 510, 548 (2005) ("because there was no violation of

12  California law governing accomplice corroboration in this case, we need not decide whether any

13  such violation would have infringed defendant's federal due process rights on a theory that it denied

14  him a state-created right.").

15      Importantly, section 1111's limitation on criminal judgments based on uncorroborated

16  accomplice testimony is not itself a "clearly established" component of federal due process.  *See*

17  *United States v. Augenblick,* 393 U.S. 348, 352 (1969) ("When we look at the requirements of

18  procedural due process, the use of accomplice testimony is not catalogued with constitutional

19  restrictions."); *Laboa,* 224 F.3d at 979 ("As a state statutory rule, and to the extent that the

20  uncorroborated testimony is not 'incredible or insubstantial on its face,' [section 1111] is not

21  required by the Constitution or federal law"); *Odle v. Calderon*, 884 F. Supp. 1404, 1418 (N.D. Cal.

22  1995) ("corroboration of accomplice testimony [as required by section 1111] is not a federal

23  constitutional requirement.").

24      Thus, a habeas petitioner may base their claim for relief on California's section 1111 under

25  one—and only one— "clearly established" federal rule: the state cannot "arbitrarily deprive" the

26  petitioner of a state-created entitlement, namely, an entitlement to sufficiently corroborated

27  accomplice testimony under section 1111.  *Laboa,* 224 F.3d at 979.  Applying AEDPA's deferential

28

analysis to that question,[22] this Court must consider whether the California Court of Appeal was objectively unreasonable in allowing petitioner's conviction to stand given the use of accomplice testimony.  Because the Court of Appeals did not articulate a reasoned decision on this issue, this Court must (1) determine what arguments or theories "could have supported" the Court of Appeals decision, and then, (2) ask whether petitioner has established that all fairminded jurists would agree that those arguments or theories "are inconsistent with the holding in a prior decision of [the U.S. Supreme Court]."  *Harrington*, 562 U.S. at 102.

### 3. Discussion

Based on careful review of the record, this Court finds the Court of Appeal could have concluded, based on the totality of the evidence before it, that the trial court's decision permitting Martin's testimony to stand did not constitute an arbitrary deprivation of petitioner's state law entitlement under section 1111.  The Court of Appeals decision carefully surveyed the evidence and testimony put forth by non-accomplice witnesses to conclude that Martin's account was adequately corroborated as to satisfy section 1111.  Ex. 9 at 18-21.

The Court of Appeals could have thus concluded that the trial court "did not arbitrarily deny

---

[22] Petitioner insists that a *de novo* standard of review should apply.  Dkt. No. 30 at 41 (Traverse).  The Court disagrees.  Although the California Court of Appeal decision did not address the arbitrary-denial due process claim, this Court may presume the Court of Appeal "adjudicated the claim on the merits."  *Harrington*, 562 U.S. at 99.  The presumption may be rebutted if the "evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court."  *Johnson v. Williams*, 568 U.S. 289, 303 (2013).  However, if the Court of Appeal could have regarded "a fleeting reference" to a federal claim in an appellant's papers as insufficient to "raise a separate federal claim," *id*. at 299, or "simply regard[ed] a claim as too insubstantial to merit discussion," the presumption of a merits-adjudication, and thus AEDPA's standard, remain in place even absent a sustained discussion of the federal claim.  *Id*.

Here, petitioner's opening brief to the Court of Appeal stated: "The judgment should be reversed because it is based on the uncorroborated testimony of accomplices, violating Penal Code section 1111 and due process. (U.S. Const., amend. XIV; Cal. Const., art. I, § 15; § 1111; *Hicks v. Oklahoma* (1980) 447 U.S. 343.)."  Ex. 6 at 34. Dkt. No. 13-10 at 49.  The case cited therein, *Hicks v. Oklahoma*, contains the Supreme Court's pronouncement that the arbitrary-denial-of-state-entitlements framework.  447 U.S. at 346.  Because the federal due process claim was located prominently in petitioner's brief to the California Court of Appeal, this Court cannot conclude that the Court of Appeal "overlooked" the claim.

[petitioner] of a state-created entitlement," but had adequate record evidence on which to find sufficient evidence to satisfy section 1111. *Id*. Because petitioner fails to carry his burden of establishing that *no* fairminded jurists would agree that such a conclusion is consistent with *Hicks v. Oklahoma*, 447 U.S. at 346, he is not entitled to habeas relief on that basis.

**B. Due Process Claim based on Sufficiency of the Evidence (Ground 2)**

In Ground 2, petitioner asserts that judgment violated due process because it is not supported by sufficient evidence. Dkt. No. 21 at 25. The Court finds petitioner is not entitled to relief on this basis.

**1. Petitioner's Claim and Decision Below**

Petitioner argues the testimony of Tony Martin and George Hellums was "inherently improbable and insubstantial," and thus "insufficient to support Mendoza's conviction of first-degree murder." Dkt. No. 21 at 25. At trial, Martin testified he saw petitioner shoot the victim. Hellums testified that, in the getaway car after the shooting, petitioner told him he shot the victim twice in the stomach and once in the back. Both testified that, later that night, petitioner told them he shot the victim because he was a "Scrap."

To undermine the veracity of Martin's testimony, petitioner points out that Martin's story changed between the initial police interview and the subsequent trial testimony. *Id*. at 25-26. For example, Martin initially told police he was nowhere near the shooting and did not see it happen, but later, facing threats of prosecution, testified "that he walked into the garage as Mendoza shot Navarro two or three times." *Id*. at 26. Petitioner also argues Martin's testimony is "inconsistent" with the other witnesses, none of whom included petitioner in their respective groupings of who they saw confront Navarro before the shooting. *Id*. (Boggiano said: Martin and Moreno confronted Navarro) (Sanchez said: Martin, Moreno, Hellums, and Donaldson confronted Navarro) (Tejada said: Moreno and Donaldson confronted Navarro). Petitioner further argues Martin's identification is directly contradicted by Erick Tejada, who told detectives he saw Donaldson pull out a .38 and shoot Navarro twice, *id*., and Francisco Serrano, who told detectives he saw Hellums shoot Navarro.

*Id.*

Petitioner similarly argues Hellum's testimony is inherently improbable and unreliable. First, petitioner argues Hellums implicated petitioner only after being himself threatened with prosecution for the murder. *Id.* at 27. Hellums was placed into the Witness Assistance program shortly after providing his initial statement to police, and remained in that program, receiving monetary stipends, for nearly two years by the time he testified at the second trial. *Id.* At the second trial, Hellums "admitted that he had lied to the police officers and the grand jury." *Id.* Hellums also denied being in the garage when the shooting happened, denied telling Martin to "start bustin," and denied even seeing Martin or hearing any additional shots fired outside the garage. *Id.*

Petitioner raised his sufficiency of the evidence claim on direct appeal before the California Court of Appeal. In a reasoned opinion, the Court of Appeal concluded neither Martin's nor Hellums' account was impossible or inherently improbable, and thus held petitioner's conviction was supported by substantial evidence:

### … Sufficiency of the Evidence as a Whole

Defendant Mendoza alternatively submits that the judgment against him violates due process and should be reversed because the evidence against him, viewed as a whole, was insufficient to support the murder conviction. The main evidence was provided by Tony Martin and George Hellums, and their testimony, he asserts, was so unreliable and inherently improbable, and the corroborating evidence so slight, that no reasonable jury could have found him guilty beyond a reasonable doubt. We cannot agree.

Defendant Mendoza maintains that the testimony of Tony Martin and George Hellums was too unreliable and inherently improbable to be believed because it was coerced by threats of prosecution, giving both men a strong incentive to lie in return for leniency; both admitted they had lied to the police; and Hellums admitted he had lied to the grand jury.[23] Additionally, Mendoza observes, Martin's

---

[23] Although defendant Mendoza contends the police "coerced" Martin and Hellums to testify against him, we note that he does not specifically assert the police acted improperly or that the alleged coercion so impaired the reliability of their testimony that it should have been excluded. (See, e.g., *People v. Williams* (2010) 49 Cal.4th 405, 452-453 [witness testimony may be excluded based on improper police coercion], but see *People v. Badgett* (1995) 10 Cal.4th 330, 354-355 ["We have never held . . . that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced"].)

description of events at trial contradicted his earlier statements to the police, Hellums' complete denial of all bad acts, was unbelievable on its own, and contradicted Martin's testimony about the shooting outside the garage, and both men contradicted other witnesses' testimony, i.e., about which gang members approached the victim, and the identity of the shooter.

The argument asks this court to make a determination about credibility and to resolve conflicts in evidence adduced at trial. As our own Supreme Court has confirmed, however, "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) In this case, the jury had the eyewitness testimony of Tony Martin identifying defendant Mendoza as the shooter, with corroborating evidence as discussed in the previous section.

Defendant Mendoza did not present an alibi and has not contended it was physically impossible for him to have been the shooter. Accordingly, we examine whether Tony Martin's eyewitness testimony was inherently improbable. In deciding this point, we must examine "the basic content of the testimony itself— i.e., could that have happened?—rather than the apparent credibility of the person testifying. . . . [T]he improbability must be 'inherent,' and the falsity apparent 'without resorting to inferences or deductions.' [Citation.] In other words, the challenged evidence must be improbable ' "on its face" ' [citation], and thus we do not compare it to other evidence (except, perhaps, certain universally accepted and judicially noticeable facts). The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened? [Citation.]" (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.) We here answer the question in the affirmative. Nothing in Tony Martin's testimony was inherently improbable.

Defendant Mendoza unconvincingly attempts to compare this case to *People v. Reyes* (1974) 12 Cal.3d 486 (*Reyes*), in which the court concluded the evidence was insufficient as a matter of law to convict one of the defendants. In *Reyes*, the prosecution's case against one of the defendants relied principally on the testimony of a single eyewitness who had seen a man leaving the victim's apartment with a television. (*Id*. at p. 498.) In evaluating whether the witness' testimony had been sufficient to incriminate the defendant, the appellate court observed that she had not positively identified the defendant at trial, the weather had been rainy and foggy, the light had been poor, and the witness had viewed the incident from across the street, approximately 125 feet away. (*Ibid*.) Furthermore, two other witnesses positively identified the other defendant as the man who left the apartment with a television, and a third testified he was certain the defendant in question had not been the man. (*Ibid*.) In light of these facts, and the other defendant's "convincing trial confession," the court concluded the one witness' "inherently insubstantial testimony" did not suffice to incriminate the defendant. (*Id*. at p. 499.)

In contrast, here, Tony Martin did positively identify defendant Mendoza as the shooter and that identification was not subject to the type of doubt present in *Reyes*, because Martin testified that he had known Mendoza for two years by that

United States District Court
Northern District of California

time, and that Mendoza actually grabbed and pushed him aside before shooting the victim. No other witness who was in the garage at the time of the shooting contradicted Martin's testimony identifying Mendoza as the shooter at trial. Although Cristina Boggiano and Guadalupe Sanchez did not describe defendant Mendoza as having been among the small group of Norteños who approached the victim before the shooting, this did not create a conflict with Tony Martin's account, as Martin testified Mendoza approached after the assault commenced, and the jury heard evidence that Mendoza may have needed to retrieve his gun from the purse of one of the young women.

The fact that Erick Tejeda and Francisco Serrano may initially have thought someone else was the shooter does not create a contradiction rendering Tony Martin's trial testimony inherently improbable or unsubstantial. It was not surprising that witnesses' recollections varied given that the shooting occurred amidst a crowd of people, the lighting was poor, events unfolded rapidly once the group of Norteños returned to the garage, and most party attendees did not know anyone in the Norteño group apart from Hellums. In addition, both Tejeda and Serrano insisted at trial they had not actually seen the shooter. Tejeda testified that the events happened so quickly he was not even sure at the time what he had seen and, as discussed, the prosecution offered a seemingly credible explanation for the description of the shooter that Serrano initially supplied and later recanted. (See, *supra*, at p. 11.) In sum, Tony Martin's testimony was neither physically impossible nor inherently improbable.

We reach the same conclusion as to George Hellums' testimony. Defendant Mendoza does not contend Hellums' testimony was physically impossible and cites no evidence demonstrating that it was inherently improbable. Pointing again to Guadalupe Sanchez's inconclusive testimony describing the group of Norteños who approached the victim before the assault, and to the testimony of Officer Hynes and the Serrano brothers about Francisco Serrano's unsworn and subsequently recanted description of the shooter, Mendoza at best creates a question of fact, which the jury apparently resolved against him. It is not our place to reweigh that evidence on appeal.

The other cases that Mendoza cites to support his argument that the court should reject Martin's and Hellums' testimony also are distinguishable. In *In re Eugene M.* (1976) 55 Cal.App.3d 650, a minor was convicted solely on the basis of an out-of-court statement made by a 16-year-old alleged accomplice under threat of prosecution, which the accomplice later recanted under oath at trial. (*Id.* at p. 657.) The court observed that the accomplice's out-of-court statement was "apparently confused and intermingled with the narrative of another crime" (*id.* at p. 658), and concluded it was "'so fraught with uncertainty as to preclude a confident determination of guilt beyond a reasonable doubt.' [Citation.]" (*Id.* at p. 659.) The same cannot be said of Tony Martin's testimony under oath at trial unequivocally identifying defendant Mendoza as the shooter.

In *People v. Lang* (1974) 11 Cal.3d 134, which Mendoza also cites, the court merely suggested, after acknowledging the matter had not been properly briefed, that appellate counsel should at least have attempted a sufficiency of the evidence

argument characterizing the victims' testimony as inherently improbable and insubstantial, because none of the victims' witnesses supported their account that a crime was committed in their presence. (*Id.* at p. 139.) Here, in contrast, there is no dispute a murder was committed, and reviewing the whole record in the light most favorable to the judgment below as we must, we are satisfied it is supported by substantial evidence. Although the credibility of key prosecution witnesses Tony Martin and George Hellums could reasonably be challenged, neither gave an account that was physically impossible or inherently improbable.

Ex. 9 at 21-25, Dkt. No. 13-10 at 284-287. (footnote in original, renumbered here).  The California Supreme Court silently denied review of the sufficiency of the evidence claim.  Ex. 11.  Thus, this Court "looks through" the silent denial to the reasoned opinion of the California Court of Appeal to evaluate the sufficiency-of-the-evidence claim through AEDPA.  *Wilson*, 138 S.Ct. at 1192.

### 2. Legal Standard

To prevail on a sufficiency of the evidence claim (a "*Jackson*" claim), a defendant must establish that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  If, in "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction must stand.  A reviewing court must presume that the trier of fact resolved any conflicts in the evidence in favor of the prosecution, *id.* at 326, and provide "near-total deference" to a jury's credibility determinations.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("The *Jackson* standard . . . looks to whether there is sufficient evidence which, if credited, could support the conviction.").

AEDPA imposes an even "high[er] bar" on *Jackson* claims, subjecting conviction "to two layers of judicial deference."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).  When considering a habeas petitioner's *Jackson* claim, "'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court."  *Id.*  The federal court may only overturn the conviction "if the state court decision was 'objectively unreasonable,'" *id.*, such that it falls "below the threshold of bare rationality."  *Id.* at 656.

### 3. Discussion

The Court cannot conclude the California Court of Appeal decision resulted in an objectively unreasonable application of *Jackson*. Viewing the evidence in the light most favorable to the prosecution, and giving deference to the jury's credibility determinations, the Court concludes that any rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt.

Petitioner's challenges to Martin and Hellums "focuses on evidence undermining the reliability" of their accounts, and "foregoes any analysis of evidence supporting [the] conviction." *Santoyo v. Hedpath*, No. CV 08-5463-R (JEM), 2009 WL 3226516, at *17 (C.D. Cal. Oct. 5, 2009). Petitioner suggests, for example, that Martin and Hellums had incentives to fabricate their accounts when faced with potential prosecution. Petitioner also contends both Martin and Hellums admitted lying to police and the grand jury, and changed their stories as time went on. Stated differently, petitioner argues the jury could have found Martin and Hellums unreliable and not credible, such that their testimony at trial was "inherently improbable and insubstantial." But under *Jackson*, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). Although the evidence *could have* permitted the jury find Martin and Hellums' testimony not credible, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

Here, the historical facts could have permitted the jury to credit Martin's account. Although Boggiano, Sanchez, and Tejada did not testify that petitioner was in the small group that initially confronted Navarro in the garage, such testimony does not contradict Martin, who testified that petitioner pushed his way past Martin to shoot Navarro after the fighting had already begun. And while Erick Tejeda and Francisco Serrano might have identified Donaldson and Hellums, respectively, as the shooter, the Court of Appeal noted that such variations were unsurprising given how quickly and chaotically events unfolded. Tejada and Serrano also did not know petitioner, or

United States District Court
Northern District of California

1    the people with whom he arrived at the party, whereas Martin had known petitioner for two years,

2    was in the same gang and petitioner, and testified that petitioner grabbed him and pushed him aside

3    before opening fire.  Tejada and Serrano both later recanted their identifications at trial. Because the

4    evidence would permit a jury to find Martin's account believable, this court must presume the jury

5    believed Martin, and "defer" to that determination.

6         So too, with Hellums.   Witnesses confirmed Hellums was at the party—one of his

7    classmates, Brian Serrano, immediately recognized him from school.   There was also evidence

8    indicating Hellums was in the same getaway car as petitioner; Martin testified he saw Hellums

9    standing next to a car with Donaldson after the shooting.  Further, the forensic evidence showed that

10   Navarro was shot once in the stomach, twice in the upper thighs, and once in the back. Although

11   this forensic account varies from Hellums' testimony (i.e., that petitioner told him he shot the victim

12   twice in the stomach and once in the back), the jury could have still found Hellums' account

13   believable.  Thus, notwithstanding the potential incentives to fabricate faced by Martin (via threats

14   of prosecution), and by Hellums (via threats of prosecution and the benefits of witness protection),

15   the jury could have still credited their testimony, and this court is bound to accept that possibility.

16        The California Court of Appeal was thus not objectively unreasonable in concluding that

17   Martin's and Hellums' testimony, along with other corroborating evidence, would enable a trier of

18   fact to find petitioner guilty beyond a reasonable doubt.   Other than Martin's and Hellums'

19   testimony, the evidence against petitioner included: (1) his gang affiliation, his role as an enforcer,

20   and knowledge that Juarez identified Navarro as a rival gang member, (2) testimony indicating he

21   was with the Norteño group in the hours leading up to the party, and attended the party as well, and

22   (3) subsequent text messages sent by petitioner to his girlfriend which were consistent with a

23   culpable state of mind (e.g., "Make sure *u dont* say *shyt forreal*….*an yo* friend," and "If *sumthen*

24   *eva happns* to me would u stick *bu myside* regardless of *wat it iz*.").

25        Given this corroboration, the Court cannot find Martin's or Hellums' testimony "inherently

26   improbable and insubstantial." Thus, the Court cannot find the California Court of Appeal's

27   determination that substantial evidence existed to support the conviction fell "below the threshold

28   of bare rationality." *Coleman,* 566 U.S. at 656.

**C. Confrontation Clause and Due Process Claim based on Cross Examination (Ground 3)**

In Ground 3, petitioner asserts the trial court's restrictions on his cross-examination of Tony Martin violated his right to confront the witnesses against him, his right to present a defense, and his rights to due process.  Dkt. No. 21 at 29.  The Court declines to grant relief on this basis.

**1. Petitioner's Claim and Decision Below**

A little more a week after the birthday party shooting, Tony Martin was identified in a separate gang-related homicide of a suspected Sureño.  Dkt. No. 13-7 at 132 (Reporter's Transcript). Petitioner's present claim arises from the trial court's imposition of limitations on his ability to cross-examine Martin on that separate murder charge. As he argued below, petitioner believes that had these limitations not been imposed, Martin "might have" admitted that he hoped to receive leniency in the other case in exchange for testifying against petitioner, thereby undermining his credibility before the jury. The California Court of Appeal lucidly described the background of the claim:

> At a pretrial hearing, over Mendoza's objection, the trial court granted a prosecution motion to limit Tony Martin's cross-examination, by precluding questioning about the unrelated murder case, after the prosecution declined to grant Martin immunity. Defendant Mendoza's counsel had requested leave to directly ask Martin whether he was the shooter in the other case. In the event Martin denied it, counsel proposed to challenge his credibility by presenting the testimony of two eyewitnesses and a responding police officer.
>
> Citing Evidence Code section 352, the trial judge denied the request, observing that she did not want to hold a mini-trial within a trial, and could not permit questioning before the jury that undoubtedly would cause Martin to invoke his constitutional privilege against self-incrimination.[24] Recognizing that the matter was relevant to credibility, however, she instructed the parties to work together to develop stipulated facts that might be read to the jury about the unrelated murder charges then pending against Martin.
>
> Defendant Mendoza renewed his objection to this ruling on the first day of trial, arguing that it unduly limited his cross-examination of Martin. The trial judge again overruled the objection, reiterating that she expected Martin would invoke

---

[24] The Fifth Amendment to the United States Constitution.

23

his privilege against self-incrimination if questioned under oath about the other murder. Although she offered to allow defense counsel to test the point by questioning Martin out of the jury's presence, with his counsel present, defendant Mendoza's counsel did not pursue this offer, electing instead to work with the prosecution on stipulated facts.

During a break in proceedings two days later, the prosecutor told the court she would be calling Martin as the next witness. Acknowledging that defense counsel had hoped to read the stipulated facts to the jury before cross-examining Martin, the prosecutor advised that the parties had not yet reached agreement on a final version. Referring to her prior ruling, the trial judge then cautioned both defense counsel to refrain from questioning Martin about the unrelated murder charge. Without objecting, defense counsel assured the court they understood.

Both the prosecution and defendant Moreno subsequently questioned Martin, after which the parties conferred with the trial judge in chambers, apparently about the stipulation. Defendant Mendoza's counsel then also cross-examined Martin. When he reached the end of his cross-examination, counsel asked to resume the earlier dialogue with the judge. Observing that they did not have sufficient time at that point, however, the judge refused, and counsel concluded his cross-examination of Martin without objection.

The trial proceeded for three more days (over the course of a week). On the fourth day after Tony Martin completed his testimony, the parties gave the court an update on their progress in negotiating a stipulation, and explained their two remaining areas of disagreement. Their first disagreement concerned the prosecution's inclusion of information from the police report about the amount of time (90 minutes) that had elapsed between the shooting in Martin's unrelated murder case and the eyewitnesses' identification of Tony Martin as the shooter. Defendant Mendoza's counsel objected that the information was irrelevant to Martin's credibility, and he had not had an opportunity to speak with the officer who prepared the report. The judge overruled the objection and Mendoza does not challenge that ruling on appeal.

The second disagreement concerned inclusion of a broad statement that the prosecution had offered Tony Martin no deals or promises in the second case for his testimony in this matter. Observing that Martin already had testified he was not receiving any deals other than the 10-year plea deal in this case, defendant Mendoza's counsel objected that the jury should be entitled to draw its own conclusion about whether Martin was telling the truth, and that the existence or nonexistence of other deals was not relevant to Martin's credibility. The trial judge adopted a compromise to resolve this objection.

Martin's interview with the district attorney's office after the first trial, during which he apparently agreed to testify in the second trial, had been recorded, and copies of the recordings had been provided to defense counsel. The trial judge instructed the parties to locate on those recordings, and add to the stipulation, a statement that the prosecution told Martin in that interview he would not receive a deal in the second murder case for testifying in this matter. When defendant

24

Mendoza's counsel interjected that he also wanted to include a statement from an earlier Martin interview, during which, he maintained, Martin had been told "We'll help you out," the judge agreed, telling the parties, "Get the statements that you have. That's what I want included."

Later that day, without objection, defendant Mendoza's counsel read the following stipulated facts to the jury: "On August 29, 2011, at approximately 10:00 p.m. in Hillcrest Park in Concord, Ever Osario, Alejandra Balderas, Idalia Sanchez, and Osmin Sanchez were approached by two males, one wearing black and one wearing white. The males confronted the group and asked what they 'claimed.' The males demanded their money, cell phones and car keys. The male wearing the black lifted Ever Osario's shirt, saw a blue belt, and yelled 'Scrap.' The male wearing the black repeatedly stabbed Ever Osario. As victim Osario attempted to flee the male wearing white fired a handgun and struck victim Osario in the upper torso.

"Less than five minutes later, the male wearing black and the male wearing white were arrested less than 650 yards away from the scene, both were sweaty and out of breath. An hour and a half later Alejandra Balderas and Idalia Sanchez were transported to the site of the arrest and both immediately identified the male wearing white as the person responsible for shooting the victim Osario, stating, 'the one in white shot him.' The male wearing white was positively identified as Tony Martin.

"Tony Martin is charged with attempted robbery, attempted carjacking and murder, a criminal street gang enhancement, an enhancement for intentionally discharging a firearm resulting in death, and two specific allegations, that the murder of victim Osario was committed to further the activities of a criminal street gang and that the murder was committed during the course of an attempted robbery. On May 14, 2013 when Tony Martin was interviewed by the District Attorney's Office, Mr. Martin was informed he was not being given any deal on his Concord case in exchange for his testimony in this case."

In his closing argument, defendant Mendoza's counsel theorized that Martin identified defendant Mendoza as the shooter because he hoped to build credibility with the police, thereby helping himself in the other murder case. Then, attempting to cast doubt on evidence indicating Martin was receiving no leniency in the other case for his testimony in this matter, defense counsel hypothesized what might really have happened during Martin's May 14, 2013 interview at the District Attorney's office. Playing the role of the prosecutor, he said: "So, Tony, tell you what[?] You come and testify, we'll give you 10 years, and no promise on your [other murder] case 'cause everything's aboveboard and we're all super honest here. It's all about justice and nothing else. It's all aboveboard. Come on in. You take the stand."

Ex. 9 at 25-29 (footnote in original, renumbered here). The California Court of Appeal considered petitioner's argument that the trial court's evidentiary rulings violated his constitutional rights. Citing the "wide latitude" trail judges retain "to impose reasonable limits on cross examination,

'based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant,'" the Court of Appeals concluded the trial court did not abuse its discretion in imposing limitations on Martin's cross examination. Ex. 9 at 29 (citing *Delaware v. Van Arsdall* 475 U.S. 673, 679 (1986)).  The Court of Appeal agreed with the trial court's prediction that Martin—having not been granted immunity in the separate case—would have asserted his Fifth Amendment right against self-incrimination. *Id*. at 29.  The Court of Appeal also remarked that the trial court "recognized" the relevance of the separate murder case to Martin's credibility, and thus "properly provided the parties the alternative of negotiating a set of stipulated facts on the topic, which defendant Mendoza's counsel then read to the jury." *Id*. at 32.  Specifically, petitioner's counsel was able to present the following facts to the jury:

> Martin originally was indicted and charged with murder and attempted murder in this case; if found guilty, he could have received a life sentence; he repeatedly lied to police when first questioned about the shooting; as a co-defendant, he heard all the witnesses testify in the first trial, and had opportunity to read the police reports; after the first jury deadlocked, he agreed to testify in the next trial and to plead guilty to an unspecified violent crime with a 10-year sentence; and on the night of Martin Navarro's murder, Martin fired at least five times into an occupied vehicle, apparently wounding Naomi Caballero.

*Id*. Although "this impeachment evidence [did not] suffice[] to make Martin's testimony inherently improbable," the Court of Appeal reasoned, "it did present ample reason for the jury to scrutinize his testimony with considerable care."  *Id*.  Thus, the Court of Appeal concluded that "[e]ven if the trial court had erred in precluding [petitioner] from cross-examining Tony Martin about the unrelated murder case," the error was harmless beyond a reasonable doubt because "the jury was sufficiently apprised there were reasons to doubt Martin's credibility."  *Id*. at 35.

The California Supreme Court silently denied review of petitioner's claim. Ex. 11, Dkt. No. 13-10 at 453.  Thus, this Court "looks through" the silent denial to the reasoned opinion of the California Court of Appeal to evaluate petitioner's claim under AEDPA.  *Wilson*, 138 S.Ct. at 1192.

United States District Court
Northern District of California

**2. Legal Standard**

The Sixth Amendment's Confrontation Clause guarantees criminal defendants "an *opportunity* for effective cross-examination, not cross-examination that is effective in every way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original). Trial courts accordingly retain "wide latitude" to impose reasonable limits on cross-examination, "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Fensterer*, 474 U.S. at 20. Thus, while the Confrontation Clause guarantees "a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), that guarantee "is not unlimited, but rather is subject to reasonable restrictions," such as state or federal evidentiary rules. *United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'").

While an outright denial of a defendant's right to inquire "into why a witness may be biased" would violate the Confrontation Clause, there is no violation "as long as the jury receives sufficient information to appraise the biases and motivations of the witness." *Fenenbock v. Director of Corrections*, 692 F.3d 910, 919-20 (9th Cir. 2012). *See also Van Arsdall*, 475 U.S. at 679 (holding trial court violated defendant's Confrontation Clause rights by prohibiting "all inquiry into the possibility" that a witness was biased). Among other factors,[25] a finding that the defendant received sufficient opportunity to probe the veracity of a witness could permit a court to find an alleged error

---

[25] The additional factors a court may consider when evaluating whether an error was harmless include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

United States District Court
Northern District of California

"harmless beyond a reasonable doubt," precluding relief. *Van Arsdall*, 475 U.S. at 684.

Petitioner is only entitled to habeas relief if the California Court of Appeal's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C § 2254(d)(1). Furthermore, petitioner must satisfy this Court that any asserted constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which is more demanding than the harmless error standard articulated in *Van Arsdall*, 475 U.S. at 684. "Under this [*Brecht*] standard, habeas petitioners…are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637.

### 3. Discussion

The Court cannot conclude the California Court of Appeal applied "clearly established" federal law in an inconsistent or objectively unreasonable manner in denying petitioner's claim. The Court of Appeals concluded, based on careful review of the trial court record, that petitioner had sufficient "opportunity" to impeach Martin's credibility on cross-examination by pointing out Martin's lies to police, his inconsistent accounts, his own liability in the case, the plea deal he received for testifying against petitioner (i.e., 10 years for the shooting of Naomi Caballero outside the party), and the most critical facts of the separate murder charge. The Court of Appeal reasonably concluded that this impeachment evidence provided petitioner "a meaningful opportunity to present a complete defense." *Crane,* 476 U.S. at 690.

The Court of Appeal was also objectively reasonable in concluding the trial court's restrictions on cross-examination fell within the permissible "latitude" retained by trial judges to limit cross-examination into marginally relevant or confusing collateral issues. *Fensterer*, 474 U.S. at 20. The Court of Appeal reasonably credited the trial court's prediction that Martin would invoke his right against self-incrimination if cross-examined on the separate murder, because he had not

28

received immunity in that case.  The Court of Appeal's determination that the stipulation was adequate to serve petitioner's intended impeachment purposes also did not constitute an "arbitrary" or "disproportionate" use of state evidentiary rules, as the stipulation permitted petitioner to introduce the most "critical facts" to the jury.  *Scheffer*, 523 U.S. at 308.  As the Court of Appeal put it, the stipulation "constituted significant impeachment evidence," which conveyed the "critical facts" about Martin's alleged crime: "i.e., that he had been found in the vicinity where the shooting occurred, was positively identified as the shooter by two eyewitnesses within hours, and was charged with murder and other crimes and enhancements."  Ex. 9 at 34.

Even assuming, *arguendo*, that constitutional error occurred and the Court of Appeal was objectively unreasonable in holding otherwise, petitioner cannot satisfy the "actual prejudice" standard of *Brecht,* 507 U.S. at 637.   Petitioner insists the jurors "might have" received a significantly different impression of Martin's credibility had petitioner been able to cross-examine him about his "hope" of receiving a more lenient sentence in the separate murder case in exchange for his testimony against petitioner.  But petitioner's counsel was in fact "allowed to suggest in his closing argument that Martin may been motivated to testify in this case by a hope, or undisclosed promise, of leniency in the other case."  Ex. 9 at 34.  That suggestion at closing, coupled with the stipulation, would have enabled the jury to conclude that Martin held out "hope" for favorable terms in the separate murder case.  The defense also informed the jury that Martin received a plea deal in the instant case and lied in the past. Any additional cross-examination on the topic of the separate murder case would thus have added little, if anything, to the impeachment that did take place. The Court thus cannot conclude that petitioner suffered "actual prejudice" as required by *Brecht,* 507 U.S. at 637.

**D. Due Process Claim based on Prosecutorial Misconduct (Ground 4)**

In Ground 4, petitioner argues that four instances of prosecutorial misconduct entitle him to habeas relief: (1) the prosecutor "vouched" for the credibility of a key witness, (2) the prosecutor argued facts not in evidence, (3) the prosecutor "impugned" the integrity of defense counsel, and (4) the prosecutor deliberately misled the jury by exploiting the limitations on Martin's cross examination. Dkt. No. 21 at 36-48. The Court finds Ground 4 procedurally defaulted and petitioner's asserted "cause" for default unexhausted.

At trial, petitioner did not raise contemporaneous objections to the four instances of alleged misconduct that comprise Ground 4. In California, "a defendant's failure to object and to request an admonition is excused only when 'an objection would have been futile or an admonition ineffective.'" *People v. Fuiava* 53 Cal.4th 622, 679-680 (2012). On direct appeal, petitioner—represented by new counsel—argued that trial counsel's objection would have been futile, and no admonishment would have cured the harm. Ex. 6 at 85. Dkt. No. 13-10 at 100. The Court of Appeal carefully analyzed the applicable state law and concluded that petitioner did not establish futility, rendering those claims forfeited. Ex. 9 at 36-39, Dkt. No. 13-10 at 421-23.

The Court of Appeal alternatively rejected petitioner's claims on the merits "[e]ven if" they were not forfeited. *Id*. at 39. The Court of Appeal thus "'clearly and expressly' state[d] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding").

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Forfeiture based on California's contemporaneous objection rule qualifies as an independent and adequate state law ground. *See Zapata v. Vasquez*, 788 F.3d 1106, 1111 (9th Cir. 2015) (failure to object to prosecutorial misconduct imposes procedural bar). Accordingly, petitioner's Ground 4 is procedurally defaulted.

The procedural bar may be lifted, however, if petitioner demonstrates cause and prejudice for the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (given procedural default, federal

habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

For the first time in the Traverse, petitioner argues his failure to contemporaneously object at trial was caused by trial counsel's ineffective assistance.  Dkt. No. 30 at 63, 76.  Petitioner is correct that ineffective assistance of counsel "is cause for procedural default."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  However, the exhaustion doctrine "generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Id*.  The "exhaustion doctrine would be ill served by a rule that allowed a federal district court 'to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.'"  *Id*. (citing *Darr v. Burford*, 339 U.S. 200, 204 (1950)).  Those concerns "hold[] true whether an ineffective assistance claim is *asserted as cause for a procedural default* or denominated as an independent ground for habeas relief."  *Id*. (emphasis added).  Petitioner's underlying claim of ineffective assistance of trial counsel claim has not been presented to the state courts.[26]  Accordingly, the asserted "cause" for procedural default is unexhausted and will not be considered by this Court.[27]

### E. Due Process and Section 1111 Claim Based on Jury Instructions on Accomplice Testimony (Ground 5)

In Ground 5, petitioner argues the trial court's instructions to the jury on how to assess the

---

[26] Or, for that matter, to this Court. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief.").

[27] In "limited circumstances," a district court may issue a "stay and abeyance" of a habeas petition containing both exhausted and unexhausted claims to enable a petitioner to fully present the unexhausted claims to the state courts.  *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Petitioner does not request a stay and abeyance here. Even if petitioner did request such a procedure, "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court."  *Id*.  Petitioner makes no attempt to demonstrate good cause.  Further, even if good cause is shown, granting a stay to allow a petitioner to pursue "plainly meritless" unexhausted claims would be an abuse of discretion.  *Id*.  The Court opines, but does not decide, that petitioner fails to "overcome the presumption that, under the circumstances" trial counsel's failure to object or request admonishment "might be considered sound trial strategy."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

United States District Court
Northern District of California

testimony of Tony Martin and George Hellums were "incorrect and inadequate." Dkt. No. 21 at 50. The Court finds petitioner not entitled to relief on this basis.

### 1. Petitioner's Claim and Decision Below

"Using a standard instruction, CALCRIM No. 334, the trial court directed jurors to decide whether Tony Martin and George Hellums were accomplices and, if they concluded either was an accomplice, on the need for corroboration and caution in viewing that witness's testimony." Ex. 9 at 50, Dkt. No. 13-10 at 435 (Court of Appeal decision). Petitioner contends the use of CALCRIM No. 334 violated his right to due process and section 1111 because it did not inform the jury that (1) Martin was an accomplice as a matter of law, and (2) Hellums was an accomplice if the murder was a natural and probable consequence of a gang assault he aided and abetted or conspired to commit. Dkt. No. 21 at 50.

CALCRIM No. 334, petitioner argues, "was inadequate because it made Martin and Hellums accomplices only if they committed, conspired to commit, or aided and abetted murder." (Rather than a gang assault *resulting* in murder). Had the correct instruction been issued, petitioner contends, the jury may have viewed the testimony of Martin and Hellums with greater "caution and disregard it if it was not independently corroborated." Dkt. No. 30 at 96.

Although the California Court of Appeal was skeptical whether petitioner's "claim of error [was] cognizable on appeal," Ex. 9 at 52 n. 41, the Court of Appeal proceeded to deny the claim on the merits:

> Using a standard instruction, CALCRIM No. 334, the trial court directed jurors to decide whether Tony Martin and George Hellums were accomplices and, if they concluded either was an accomplice, on the need for corroboration and caution in viewing that witness's testimony. Defendant Mendoza maintains the trial court violated section 1111 and his constitutional due process rights by using this instruction because it was incorrect and incomplete. It was incorrect to use CALCRIM No. 334 with respect to Tony Martin, he submits, because Martin was an accomplice as a matter of law and the trial court therefore was obligated sua sponte to instruct the jury with CALCRIM No. 335 instead. CALCRIM No. 334 also was incomplete, he submits, because it did not specifically inform jurors that Tony Martin and George Hellums were accomplices if they aided and abetted the assault on Martin Navarro, with murder being a natural and probable consequence.

Although the trial court gave standard instructions explaining aiding and abetting principles (CALCRIM Nos. 400, 401), and the natural and probable consequences doctrine (CALCRIM No. 403), Mendoza submits this was inadequate.

We begin with the second contention. As given here, CALCRIM No. 334 stated in pertinent part as follows: "Before you may consider the statement or testimony of Tony Martin and George Hellums as evidence against Ricky Mendoza and Leon Moreno, you must decide whether Tony Martin and George Hellums were accomplices to that crime. *A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant.* Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact, (aid, facilitate, promote, encourage, or instigate the commission of the crime[;] [or] participate in a criminal conspiracy to commit the crime)." (See CALCRIM No. 334, italics added.)

Using CALCRIM No. 403, the trial judge also instructed: "To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault with force likely to cause great bodily injury or simple assault; [¶] 2. During the commission of assault with force likely to cause great bodily injury or simple assault a coparticipant in that assault with force likely to cause great bodily injury or simple assault committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the assault with force likely to cause great bodily injury or simple assault. [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator . . . . [¶] . . . [¶] *The People are alleging that the defendant originally intended to aid and abet assault with force likely to cause great bodily injury or simple assault. [¶] If you decide that the defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder.* . . ." (See CALCRIM No. 403, italics added.)

Defendant Mendoza submits that, notwithstanding the court's use of CALCRIM No. 403, the jury nonetheless could have understood CALCRIM No. 334 as meaning that Martin and Hellums were only accomplices if they committed, conspired to commit, or aided and abetted murder, i.e., jurors may not have understood the two were accomplices if they aided and abetted an assault, with murder being the natural and probable consequence. The trial court's failure, sua sponte, to modify or replace CALCRIM No. 334 to clarify this point, he maintains, was constitutional error. "This claim is not cognizable. It is merely a claim that an instruction that is otherwise correct on the law should have been modified to make it clearer. 'A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1165.) If defendant Mendoza had been concerned that the jury would not understand CALCRIM Nos. 334 and 403, given separately, he should have

requested a clarifying modification. He did not do so.[28] (See, e.g., *People v. DeSantis* (1992) 2 Cal.4th 1198, 1251 [trial court had no duty to modify accomplice instructions on its own motion; defendant forfeited the argument].)

In any event, we do not agree that CALCRIM No. 334 was inadequate, when viewed in the context of the instructions given as a whole. "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In this case, the jury was fully and fairly instructed on the applicable law. CALCRIM No. 334 instructed that "[a] person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant." CALCRIM No. 403 then instructed, "The People are alleging that defendant originally intended *to aid and abet assault with force likely to cause great bodily injury or simple assault*. [¶] *If you decide that the defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder*. . . ." (Italics added.) Contrary to Mendoza's contention, we think intelligent jurors would be capable of understanding from these instructions that, if they concluded Tony Martin or George Hellums had committed the crime charged against the defendant, i.e., aiding and abetting assault with force likely to cause great bodily injury or simple assault, and that murder was a natural and probable consequence, they qualified as accomplices.

Defendant Mendoza's reliance on *People v. Felton* (2004) 122 Cal.App.4th 260, as support for the proposition that the trial court here had a duty, sua sponte, to modify CALCRIM No. 334, is misplaced. In *Felton*, the trial court had refused the defendant's request for accomplice instructions, relying on CALJIC No. 3.14, which addresses accomplice liability for one alleged to be an aider and abettor, and requires criminal intent. (*Id*. at p. 267.) After concluding the trial court had erred, the appellate court observed, in dicta, that giving CALJIC No. 3.14 in an unmodified form would have only replaced one error with another. (*Id*. at p. 271.) CALJIC No. 3.14 was "legally incorrect" as applied to that case, the appellate court explained, because it did not instruct that a coperpetrator could be an accomplice, as the evidence suggested was the case for the witness there in question, or that the person's alleged crime (there, child endangerment) might not include a specific intent requirement. (*Id*. at pp. 269-271; but see CALJIC No. 3.10.) *Felton* did not

---

[28] Although we agree with defendant Mendoza that the record does not suggest his counsel made a conscious and deliberate tactical choice in requesting CALCRIM No. 334 without modification, and the invited error doctrine, therefore, does not apply (see *People v. DeHoyos* (2013) 57 Cal.4th 79, 138), it does not necessarily follow that his claim of error is cognizable on appeal. (See, e.g., *People v. Townsel* (2016) 63 Cal.4th 25, 59 [defendant forfeited a claim of instructional error for appellate purposes even though the invited error doctrine did not apply].)

address the adequacy of CALCRIM No. 334, or establish that a party may pursue such a challenge on appeal having failed to raise it in the trial court.

In any event, as was the case in *Lawley, supra*, "the jury was made keenly aware of the inconsistencies [of Tony Martin's and George Hellums's] various in-court and out-of-court statements, as well as the prosecutor's acknowledgement that [they were] not always truthful and that it was up to the jury to determine [their] credibility." (*Lawley, supra*, 27 Cal.4th at p. 161.) In this case, the parties also stipulated that Tony Martin had been positively identified as the shooter in a separate murder case. Under these circumstances, it is not reasonably probable the jury would have reached a result more favorable to defendant Mendoza had the trial court instructed it with a modified CALCRIM No. 334. (*Ibid.*, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We reach the same conclusion with respect to defendant Mendoza's remaining instructional argument, i.e., that the trial court erred in not giving CALCRIM No. 335, because Tony Martin was an accomplice as a matter of law. It was not reasonably probable jurors would have reached a result more favorable to defendant Mendoza if the trial court had instructed them, using CALCRIM No. 335, that Martin was an accomplice and corroboration of his testimony was required. Further, as discussed in section II., A., 1., c., *supra*, there was sufficient evidence corroborating Martin's testimony. Accordingly, any error was harmless. (See, e.g., *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303-304 [A court may conclude that omission of accomplice instructions is harmless either because sufficient evidence corroborated the witness's testimony, or because it is not reasonably probable that a result more favorable to the defendant would have been reached].)

Ex. 9 at 50-54, Dkt. No. 13-10 at 435-439 (footnote in original, renumbered here). The California Supreme Court summarily denied review of this claim. Ex. 11. Thus, for purposed of AEDPA review, this Court "looks through" the silent denial to the reasoned opinion of the California Court of Appeal in evaluate the claim under AEDPA. *Wilson*, 138 S.Ct. at 1192.

### 2. Legal Standard

The Supreme Court has made clear that "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The "only question" for a federal courts sitting in habeas is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). As discussed, Ground 1, *supra*, in Section A.2, a habeas claim predicated on Cal. Penal. Code § 1111 is only cognizable as a federal due

process claim if the petitioner alleged the state "arbitrarily" deprived him of his entitlement under section 1111. *Laboa,* 224 F.3d at 979 (citing *Hicks,* 447 U.S. at 346). The Supreme Court has not otherwise "clearly established" that a verdict based on uncorroborated accomplice testimony violates due process. *See Love v. McDonnell,* 2017 WL 7049526, at *7 (C.D. Cal. 2017) (failure to give accomplice instruction could not have been contrary to clearly established law, because "the corroboration of accomplice testimony is not constitutionally mandated"); *Rodriguez v. Biter,* 2015 WL 7271791, at *6 (C.D. Cal. 2015) ("[T]here is no clearly established federal law limiting the use of accomplice testimony in a criminal prosecution. As such, the trial court's failure to give cautionary instructions regarding Tapia's testimony could not have violated Petitioner's federal constitutional rights."), report and recommendation adopted by, 2015 WL 7271720 (C.D. Cal. 2015).

### 3. Discussion

The Court finds that the California Court of Appeal decision on petitioner's claim could not have been "contrary to, or involved an unreasonable application of" clearly established federal law, because the Supreme Court has never held that federal due process requires accomplice testimony be corroborated in order to support a conviction. Thus, even assuming, *arguendo,* that the jury might have viewed Martin and Hellems' testimony with an added degree of skepticism had the trial court issued petitioner's preferred instruction, the trial court's failure to do so does not raise a federal claim unless the instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle,* 502 U.S. at 72. *See also Middleton v. McNeil,* 541 U.S. 433, 437 (2004) ("[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.").

No such "infect[ion]" occurred here. As discussed in Ground 2, *supra,* in Section B.3, even assuming the jury thought both Martin and Hellums were accomplices, there was adequate corroborative testimony the jury could have relied on credit both of their accounts. The California Court of Appeal was thus not objectively unreasonable in finding, as it did, that "any error was harmless." Ex. 9 at 54. And given the existing corroborative testimony, the Court cannot find, even

United States District Court
Northern District of California

1    if it assumes constitutional error, that petitioner has established "actual prejudice" as required by

2    *Brecht,* 507 U.S. at 637.

3

**F. Due Process Claim based on Cumulative Prejudice (Ground 6)**

In Ground 6, petitioner asserts he experienced cumulative prejudice arising from the restrictions on cross examination (Ground 3), the prosecutor's improprieties (Ground 4), and the accomplice jury instructions (Ground 5). Dkt. No. 21 at 51-53. The Court cannot find petitioner is entitled to relief on this basis.

On direct review, the California Court of Appeal determined, after "reject[ing] the individual claims of error," that "there is no cumulative error requiring reversal." Ex. 9 at 54. The California Supreme Court silently denied review. Ex. 11. Thus, this Court "looks through" the silent denial to the reasoned opinion of the California Court of Appeal to evaluate the claim of cumulative prejudice under AEDPA. *Wilson*, 138 S.Ct. at 1192.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)). "[W]here the combined effect of individually harmless errors renders a criminal defense 'far less persuasive than it might [otherwise] have been,' the resulting conviction violates due process." *Id.* (citing *Chambers*, 410 U.S. at 294).

The Court cannot conclude the California Court of Appeal decision was "contrary to" or an "unreasonable application of" clearly established federal law. In this Order, this Court determined that the California Court of Appeal decision was objectively reasonable and consistent with federal law in finding none of petitioner's claims meritorious. For both Ground 3 and Ground 5, the Court of Appeal held that no error was made, but even if errors were made, the errors were harmless. Ex. 9 at 35, 54. This Court found those determinations objectively reasonable and consistent with federal law. Even if Ground 4 were properly before the Court, the Court of Appeal there held that none of the alleged instances of prosecutorial misconduct *actually amounted to error*. Ex, 9 at 50. Because only harmless *errors* can be accumulated as a matter of law, Ground 4 would not have

factored into the Court of Appeal's analysis.  Thus, because the Court of Appeal found no errors in Grounds 3, 4, or 5, this Court concludes that the Court of Appeal was not objectively unreasonable in concluding there were no errors to cumulate.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.).

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.

**IT IS SO ORDERED**.

Dated: May 31, 2022

_____
SUSAN ILLSTON
United States District Judge